IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION

| | |
|---|---|
| **BRIAN BISHOP,** | |
| **Plaintiff,** | |
| v. | CIVIL ACTION |
| **LIPMAN AND LIPMAN, INC., LFC ENTERPRISES, INC., LFC AGRICULTURAL SERVICES, INC., FARM OP, INC., LFC MANAGEMENT SERVICES, INC., ROBERT KENT SHOEMAKER JR., LARRY LIPMAN, TOBY PURSE, JAMIE WILLIAMS, MAX JAIME WEISINGER, AND HERNAN PARRA,** | Case No. _____ |
| Defendants. | |

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL WITH INJUNCTIVE RELIEF SOUGHT</u>

Plaintiff, BRIAN BISHOP, ("Bishop") hereby complains, by and through his attorneys' Garlick, Hilfiker & Swift, LLP, against Defendants, LIPMAN AND LIPMAN, INC., LFC ENTERPRISES, INC., LFC AGRICULTURAL SERVICES, INC., FARM OP, INC., LFC MANAGEMENT SERVICES, INC., ROBERT KENT SHOEMAKER JR., LARRY LIPMAN, TOBY PURSE, JAMIE WILLIAMS, MAX JAIME WEISINGER, and HERNAN PARRA.

## SUMMARY OF THE ALLEGATIONS

1.      On February 2, 2012, Bishop, Lipman's Chief Information Officer and an employee for over fourteen (14) years, wrote an email to Lipman's Chief Financial Officer and Chief of Human Resources, objecting to, and expressing his serious concerns about Lipman's practice of hiring and using illegal aliens in their farming labor, and the fact Lipman was doing nothing to curb this practice.  A mere two (2) business days later, Bishop was called into a meeting and terminated in violation of the Florida Whistleblower Act.

2.      In addition to their blatant violation of the Florida Whistleblower Act, Lipman has violated the Federal and Florida Racketeer Influenced and Corrupt Organizations Act, by engaging a pattern and practice of illegal conduct.  Specifically, Lipman knowingly employed illegal aliens, and then conspired and attempted to cover up this pattern of illegal activity by firing Bishop for his objection to Lipman's illegal business practices.

## THE PARTIES

3.      The Plaintiff, Brian Bishop (hereinafter "Bishop"), is an adult resident of the State of Florida, residing in Lee County.  At all times relevant to this action, until his termination on February 6, 2012, Bishop was employed by Lipman.

4.      Defendant, Robert Kent Shoemaker Jr., (hereinafter "Shoemaker"), is an adult resident residing in Collier County.  In September of 2010, Shoemaker was hired as the Chief Executive Officer of Lipman.

5.      Defendant, Larry Lipman, (hereinafter "L. Lipman"), is an adult resident

residing in Lee County. Prior to September of 2010 and at all times material to the Complaint, Larry Lipman served as the Chief Executive Officer of Lipman. L. Lipman maintains an ownership interest in Lipman.

6. Defendant, Hernan Parra, (hereinafter "Parra"), is an adult resident residing in Collier County. Parra was hired as the Director of Human Resources on or about May 23, 2011. Upon information and belief, Parra was terminated from employment at Lipman on or about June of 2012.

7. Defendant, Jamie Williams, (hereinafter "Williams"), is an adult resident residing in Collier County. Williams is the Director of Farming for Lipman.

8. Defendant, Toby Purse, (hereinafter "Purse"), is an adult resident residing in Lee County. At all times relevant to this matter, Purse acted as the Chief Financial Officer/Chief Administrative Officer ("CFO/CAO") of Lipman.

9. Defendant, Max Jaime Weisinger, (hereinafter "Weisinger"), is an adult resident residing in Lee County. At all times relevant to this matter, Weisinger is a member of the board of directors of Lipman.

10. Defendant, Lipman & Lipman, Inc., was at all times material herein, a privately-held domestic corporation, doing business in the State of Florida, engaged in interstate commerce with its principal place of business located at 315 East New Market Road, Immokalee, Collier County, Florida.

11. Defendant, LFC Enterprises, Inc., is a closely-held Florida corporation that maintains its headquarters in Immokalee, Collier County, Florida. LFC Enterprises, Inc. is engaged in the production of tomatoes, peppers, watermelons and other crops in

Palm Beach and other Florida counties.  Its principal place of business is located at 315 East New Market Road, Immokalee, Collier County, Florida.

12.     Defendant, LFC Agricultural Services, Inc., is a closely-held Florida corporation that maintains its headquarters in Immokalee, Collier County, Florida. Defendant, LFC Agricultural Services, Inc., is a wholly-owned subsidiary of Defendant, LFC Enterprises, Inc.  Defendant, LFC Agricultural Services, Inc., was created for the purpose of serving the objectives of Defendant, LFC Enterprises, Inc., with respect to the production and harvesting of its fresh produce, and is under the direct managerial and financial control of Defendant, LFC Enterprises, Inc., to the extent that it has no or insignificant financial assets of its own.  Its principal place of business is located at 315 East New Market Road, Immokalee, Collier County, Florida.

13.     Defendant, Farm Op, Inc., is a closely-held Florida corporation that maintains its headquarters in Immokalee, Collier County, Florida.  Defendant, Farm-Op, Inc., is a wholly-owned subsidiary of Defendant, LFC Enterprises, Inc.  Defendant, Farm-Op, Inc., was created for the purpose of serving the objectives of Defendant, LFC Enterprises, Inc., with respect to the production and harvesting of its fresh produce, and is under the direct managerial and financial control of Defendant, LFC Enterprises, Inc., to the extent that it has no or insignificant financial assets of its own.  Its principal place of business is located at 315 East New Market Road, Immokalee, Collier County, Florida.

14.     Defendant, LFC Management Services, Inc., was at all times material herein, a privately-held domestic corporation, doing business in the State of Florida, engaged in interstate commerce with its principal place of business located at 315 East

New Market Road, Immokalee, Florida 34142. Defendant, LFC Management Services, Inc., was created for the purpose of serving the objectives of Defendant, LFC Enterprises, Inc. Its principal place of business is located at 315 East New Market Road, Immokalee, Collier County, Florida.

15.    As Defendants Lipman & Lipman, Inc., LFC Enterprises, Inc., LFC Agricultural Services, Inc., Farm Op, Inc., and LFC Management Services, Inc. are all interrelated companies or subsidiaries, they will be referred hereinafter as "Lipman."

## JURISDICTION AND VENUE

16.    The Court has jurisdiction over this civil action pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1964(c). Moreover, the Court has supplemental jurisdiction over the Florida Whistleblower and Florida RICO claims pursuant to 28 U.S.C. § 1367, as they arise from the set of facts.

17.    Pursuant to 28 U.S.C. § 1391(b), venue in this Court is appropriate. All Defendants are subject to the personal jurisdiction of the Middle District of Florida, and a substantial portion of the acts underlying the claims contained in this Complaint occurred in this District.

## THE COMMON FACTS FOR ALL COUNTS

### LIPMAN CORPORATE STRUCTURE:

18.    Lipman, formerly known as "Six L's," is a privately held company and is the United States' largest field tomato farmer.

19.    Lipman's principal place of business is located in Immokalee, Florida; however it has seasonal farms located in South Carolina, Virginia and California and

processing facilities in New Jersey, Tennessee, California, Texas, and Oregon.

20.     For nearly eighty (80) years, Lipman was run by the Lipman family, but in September of 2010, Larry Lipman retired as CEO and Shoemaker, former executive at Sysco, was named his successor.

21.     In addition to the named Defendants, the officers of Lipman are Gerry Odell, Chief Farming Officer, and Darren Micelle, Chief Operating Officer ("COO").

### LIPMAN FARMING:

22.     Lipman's farms are considered "open land" because the produce is grown in fields and not greenhouses, and because of their "open land" farming operation they employ thousands of farm laborers to grow and harvest the produce.

23.     Lipman not only grows and harvests the tomatoes, but also packs, repacks, processes, and distributes tomatoes through their subsidiary packing companies to retail and restaurant chains.

24.     At the beginning of each season, farm laborers are taken to each farm and registered.

25.     In this registration process each farm laborer is issued an identification card with their picture, name, employee number and barcode.

26.     For farming laborers, Lipman uses so called "crew leaders" to find and put together a "farming crew" for each season.

27.     "Crew leaders" are hired by Lipman and are paid based on their ability to provide sufficient numbers of laborers for farming.  Notably, each laborer is employed and paid directly by Lipman and not the "crew leaders."

28.    The farm laborers are provided housing near the farming facilities ("Camps") by Lipman.  Lipman provides these facilities so that they can maintain a seasonal labor force.

29.    Each morning during the season, the "crew leaders" pick up the farming laborers at the Camps and bring them to the Lipman farms.

30.    At the "packing houses" Lipman uses biometric scanners to ensure that the person registered and issued a time card is in fact the person who shows up at the packing house.

31.    Packing plants originally worked off of time clocks, whereby an individual would simply clock in and out manually and there was no way to verify that the individual who originally received the time card upon registration was in fact the individual punching in and out every day.

32.    Once the technology for fingerprint and facial recognition software became readily available, Lipman implemented this technology at the packing houses, thereby automating the process and providing an additional level of verification that the registered person was in fact working.

33.    However, at Lipman's farms, Lipman has no verification that the person issued the identification and/or time card is in fact the person who shows up at the farm.

**BISHOP'S EMPLOYMENT AT THE COMPANY:**

34.    Bishop has an associate's degree and is a certified IT Manager and has attended numerous technical classes developed by Microsoft, New Horizons, and Florida Gulf Coast University.

35.     Bishop was hired as an Information Technology Manager on or about June 23, 1997.

36.     Bishop's responsibilities included the overseeing, management, and deployment of all computer related and information technology processes at Lipman.

37.     Bishop's salary when he started in 1997 was $42,000.  During the course of his fourteen (14) year employment, Bishop's salary was increased to $168,000, plus medical benefits, car and gas allowances, and yearly bonuses.

38.     Bishop directly supervised four (4) employees in his department.

39.     Additionally, Bishop was eligible for yearly bonuses, and was given the title of Chief Information Officer by Blake Gunn, Chief Operating Officer and Chief Financial Officer for Lipman in 2004.

40.     At the time Bishop was hired, Lipman had six (6) seasonal farming locations, and thirteen (13) email accounts.

41.     At the time of Bishop's termination in February of 2012, Lipman had over thirty (30) full time locations and three hundred and fifty (350) email accounts.

42.     Lipman's dependence and reliance on the Information Technology Department grew exponentially over time in order to keep up with its expanding farming locations and business acquisitions.

43.     This included, but was not limited to, the networking of all thirty (30) locations, implementation of biometric scanning at packing houses, automated customer information regarding the status and shipments of tomatoes, and automated time card tracking.

44.    At no time prior to Bishop's termination was any formal review conducted that brought to his attention any issues regarding his performance at his job.

45.    In fact, Bishop continually received yearly raises and performance bonuses, including a significant monetary bonus in November of 2011.

BISHOP'S OBJECTIONS TO LIPMAN'S PRACTICES:

*Bishop's Knowledge of Lipman's Employment of Illegal Aliens*

46.    Bishop became aware of Lipman's use of illegal aliens in its farming operations through his position as the Chief Information Officer of Lipman.

47.    For example, at an operations meeting attended by Bishop (and other managers and department heads at Lipman), it was disclosed that Lipman was being fined because they were submitting employee social security numbers to the Federal Government on required employment paperwork that did not match the names of the employees.

48.    At this same meeting it was disclosed that each incident was costing the company a fine payable to the Federal Government, whereby Larry Lipman, then the Chief Executive Officer, stated that he would rather pay the fines than to take the steps it would cost to be in compliance with the law.

49.    At another similar meeting, the issue of a labor shortage for the upcoming farming season was discussed and how Lipman would provide sufficient farm workers.

50.    At this meeting, David Garcia said that the crew leaders would have to use so called "coyotes" to supply the additional needed laborers.

51.    At the time Bishop did not know what a "coyote" was, but later learned

that a "coyote" is an individual who smuggles illegal migrant workers into the United States from Mexico for money.

52.     Bishop's concern over the hiring of illegal aliens was heightened in 2010, when two (2) crew leaders that provided farming laborers to Lipman were convicted of Federal crimes regarding their enslaving and abusing nine (9) migrant workers that worked on Lipman's farming fields.

53.     After this incident, Bishop once again suggested to Purse and/or Shoemaker that technology could be used to help verify and reduce the number of illegal workers.

54.     Purse and/or Shoemaker refused to implement any additional verification technology at the farms.

55.     On another occasion, on or about November of 2011, Bishop attended an administrative meeting where a member of the Lipman board, Jaime Weisinger, stated that "half of our employees are legal, but the other half - not so much."

56.     While Weisinger was making this statement, Purse was in the back of the room trying to get Weisinger's attention and gesturing for him to stop talking.

57.     After this meeting, Bishop again spoke with Purse and expressed his concerns about illegal workforce at Lipman and his suggestions for reducing the illegal workforce that could be implemented by his department, but no action was taken.

58.     On another occasion at a farming time and attendance meeting at Lipman that Bishop and other officers of Lipman attended, one of the topics was how best to track the types of activities that took place on the farms, such as company time, activity

time, and wait time.

59.     One of the participants in this meeting was Williams, Director of Farming for Lipman.

60.     At this meeting, Williams became agitated regarding the tracking of farming laborers and stated that "I don't care if they are legal – I just need warm bodies. I don't care where they are from, and I don't care if their brother is punching in for them – I just need people to harvest."

61.     After this meeting, Bishop spoke with an outside consultant who installs and maintains video and access control systems for Lipman.  This outside consultant, known as "Gunner," disclosed that Parra was intending to have hidden cameras installed at the Camps.

62.     Bishop was informed by the consultant that the installation of cameras was to identify individuals involved in known illegal activity at the Camps by Lipman, including violence, sales of illegal drugs and prostitution.

63.     Bishop confronted Purse about this matter because he had not been consulted about their installation and these cameras would normally fall under his department.

64.     Purse stated he would check on the issue and get back to Bishop, but never followed up.

65.     Subsequently, Bishop spoke with Parra about this matter in his office, and informed Parra of the comments made by Williams regarding Lipman's "hands off" approach towards farming.

66.     Bishop cautioned Parra "that he would have a difficult time trying to address issues relating to the farms with the hands off approach."  Parra responded by thanking Bishop for the information and stating "things will change."

67.     Both Bishop and Parra were later terminated.

68.     After Bishop continually expressed his concerns about the hiring and use of illegal aliens, starting in mid-2011, Bishop was systematically excluded from meetings that directly involved his department.

69.     In addition to the adverse employment actions of excluding Bishop from meetings, Shoemaker ridiculed Bishop by:

     a.     Stating he needs Omar the Tentmaker to provide attire for him, referring to his large stature, on at least two (2) occasions in front of his subordinates; and in the lobby in front of the Receptionist, Angel Long.

     b.     On another occasion in front of his subordinates, Bishop was referred to as "Tummy Bahama."

70.     At an H-2A[1] meeting in 2012 that Bishop attended at Lipman, a speaker at the event gave a talk on the illegal work force in Florida, and indicated that the percentage of illegal aliens working in Florida agriculture was between forty (40%) to sixty (60%) percent.

71.     A couple of weeks after this H-2A meeting, on February 2, 2012, Bishop and David Garcia, Lipman's Labor Manager, drove to Lipman's "Farm 9" in Boca Raton.

72.     During this ride, Bishop had a conversation with David Garcia about the H-2A speaker from a couple of weeks ago, where Bishop inquired to Garcia about

---

[1] H-2A is a type of visa that allows for temporary or seasonal agricultural work in the United States.

Lipman knowingly hiring illegal aliens on the farms.

73.     Garcia sarcastically responded "of course not." The tone and manner in which Garcia responded made it clear to Bishop that Lipman was well aware of the fact that they hired illegal aliens on the farms.

74.     Bishop asked Garcia if the percentage of illegal aliens for Lipman was about the forty (40%) to (60%) percent discussed at the H-2A meeting, to which Garcia stated that "it would surprise people to find out the real number," implying that the number of illegal aliens working at the farms was much higher at Lipman.

*Bishop's Written Objection Regarding Lipman's Practices*

75.     The same day that Bishop spoke with David Garcia (February 2, 2012) at 11:50 p.m., Bishop sent an email to Purse, the CFO/CAO of Lipman, and Hernan Parra, the Director of Human Resources, stating that:

      a.  In his capacity as the Chief Information Officer of Lipman, he was concerned that Lipman was not "doing the right thing" with respect to reducing their illegal work force

      b.  That his department (Information Technology) had developed methods of reducing their illegal work force, but that Lipman had ignored those methods with respect to the farms;

      c.  Lipman was well aware that it employed illegal aliens for farming;

      d.  He was being excluded from meetings because he expressed concern directly to Purse regarding a high level farm manager who stated at a meeting that "I don't care if they are illegal, I need warm bodies;"

      e.  There had been several incidents where Shoemaker had made derogatory comments directed at him in front of his staff, calling him "[T]ummy Bahama," and his needing "Omar the Tentmaker", as well as in the lobby of the corporate headquarters in front of the reception area.

76.     The following day, Bishop received a phone call from Weisinger asking "what are you doing?  Trying to get fired?" referring to the email that he sent the night before.

77.     Weisinger further stated that "upper management thinks you are setting yourself up for a law suit," to which Bishop responded "I have no intention of suing and I'm just voicing my concerns."

78.     In response, Weisinger stated "I hope not.  Why can't people just go away?"

79.     Bishop understood this phone call from Weisinger, a member of the Lipman Board of Directors, as a threat and an attempt to coerce him into keeping silent regarding Lipman's illegal practices.

80.     Later, Purse sent Bishop a response to his email, stating that Purse was out of the office and would discuss the issues with Bishop when he returned to the office.

### BISHOP'S TERMINATION FROM LIPMAN

81.     On or about February 6, 2012, a mere two business days after Bishop wrote the email objecting to Lipman's practice of hiring illegal aliens, Purse returned to the office and called Bishop to the front conference room at Lipman's offices in Immokalee.

82.     In the room were Parra and Purse, who informed Bishop that Lipman was terminating him from his employment at Lipman.

83.     At the meeting Bishop was offered a "Confidential Separation Agreement and General Release" worth Eighty-Four Thousand and 00/100 Dollars ($84,000) and

- 14 -

medical insurance worth Nine Thousand and 00/100 Dollars ($9,000) whereby Bishop would be retained as a consultant for six (6) months but would be required to keep silent regarding his concerns over the illegal work force pursuant to the confidential nature of the settlement and "refrain from all conduct, verbal or otherwise, that disparages or damages or could disparage or damage the reputation, goodwill, or standing in the community of LFC or any of the Released Parties."

84.     Bishop refused to sign the offered settlement agreement.

### LIPMAN'S RICO CONDUCT

85.     Lipman is engaged in an ongoing pattern of racketeering activity as defined by 18 U.S.C. § 1961 (5).

86.     Defendants Lipman, Shoemaker, Williams, Weisginer, L. Lipman, Parra and Purse, (collectively "RICO Defendants"), each constitute a "person" within the meaning of 18 U.S.C. §§ 1961(3) and 1962(c) and (d).

87.     Each RICO Defendant directly benefited from the pattern of racketeering activity as they received large yearly bonuses and/or profits derived from use of cheap labor in Lipman's farming operations that could not have been achieved with legal farming labor.

88.     At all relevant times, Lipman was a corporation owned or operated by the remaining RICO Defendants, which affected interstate commerce.

89.     The Federal RICO pattern of racketeering activity engaged in by Lipman consists of more than two acts of racketeering activity, the most recent of which occurred within ten years after the commission of a prior act of racketeering activity.

90.     Lipman is engaged in an ongoing pattern of racketeering activity as

defined by Fla. Stat. § 772.102(4).

91.    The Florida RICO pattern of racketeering activity engaged in by Lipman consists of more than two acts of racketeering activity, the most recent of which occurred within five years after the commission of a prior act of racketeering activity.

92.    For purposes of Federal RICO, the racketeering activity includes an open and ongoing pattern of violations of Section 274 of the Immigration and Nationality Act, 8 U.S.C. § 1324(a).

93.    Specifically, Lipman has violated and continues to violate 8 U.S.C. § 1324(a)(3)(A), which makes it a federal crime to:  "knowingly hire[] for employment  at least 10 individuals with actual knowledge that the individuals are aliens..." during a 12 month period.

94.    Lipman has violated this provision of the Act, including by employing more than ten (10) aliens per year each year for the last four years, knowing that each such person was (a) smuggled or otherwise brought into the United States in violation of U.S. law; (b) illegally harbored once in the United States; (c) not lawfully admitted to the United States or permanent residence; and/or (d) not authorized for employment in the United States.

95.    Lipman has also violated and continues to violate 8 U.S.C. § 1324(a)(I)(A)(iii),  which makes it a federal crime to "conceal,[],  harbor[] or shield from detection,  or attempt[] to conceal,  harbor or shield  from detection ..." aliens who have entered the U.S. illegally.

96.    Lipman has violated this provision by (a) knowingly employing illegal

aliens within its farms, warehouses and other facilities located in Florida, South Carolina, Virginia and California and/or (b) taken steps to shield those illegal aliens from detection, by, among other things, submitting false social security paperwork, setting up farming Camps for the illegal aliens to reside in, and providing transportation to and from the farming operations while knowing they are illegal aliens.

97.     Furthermore, Lipman has also violated and continues to violate 8 U.S.C. § l324(a)(l)(A)(iv), which prohibits any person or entity from "encourag[ing] or induc[ing] an alien to come to, enter, or reside in the United States,  knowing or in reckless disregard of the fact that such coming to, entry, or residence is or will be in violation of law[.]"

98.     Lastly, the firing of Bishop is a related overt act of racketeering or wrongful conduct under RICO, specifically, it violates 8 U.S.C. § 1324(a)(1)(A)(v), under which it is illegal to engage in any conspiracy to commit or aid and abet any of enumerated acts under 1324(a)(1)(A)(i)-(iv), of which the violations by the Defendants are outlined in paragraphs 46-84, 92-98, 129-136.

99.     Each violation of 8 U.S.C. § 1324 constitutes an act of "racketeering activity" under the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 (F).

100.     For purposes of both Federal and Florida RICO, the racketeering activity also includes open and ongoing violations of 18 U.S.C. § 1546(a), including Lipman's acceptance of identification documents and other documents that authorize employment in the United States that Lipman knew or had reason to know were not lawfully issued for the bearer's use, were false and/or were obtained by false statements.

101.    Lipman  has also violated and continues to violate 18 U.S.C. §  1546(b) by using identification documents that Lipman knew or had reason to know were false and/or not lawfully  issued to the bearer to falsely verify the eligibility  of the persons presenting  them to work at Lipman, and recording information  from those documents on I-9 forms.

102.    Each violation of 18 U.S.C. § 1546 constitutes "racketeering  activity" under the Federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961(8).

103.    Each violation of 18 U.S.C. § 1546 also constitutes "racketeering activity" under the Florida Racketeer Influenced and Corrupt Organizations Act., Fla. Stat. § 772.102(b).

104.    Lipman's acts of racketeering activity involve a distinct threat of long-term racketeering activity.

105.    Lipman's practice of knowingly employing, harboring, concealing  and shielding  illegal  workers and Lipman's acceptance and use of documents  that are not lawfully  issued for the use of the possessor or are false, has continued for years, is ongoing at the present  time and  will continue into the future  unless  halted  by judicial intervention.

106.    Lipman's knowing employment, harboring, concealing and shielding of illegal workers and its acceptance and use of documents that are not lawfully issued for the use of the possessor or are false is part of its regular way of conducting business. Moreover, Lipman provides housing and transportation to the illegal alien workers in

order to shield them from detection by the United States government.

107.   Lipman has engaged in an open and ongoing pattern of violations of 8 U.S.C. § 1324 and 18 U.S.C. § 1546 during the last five years through its participation in an association-in-fact enterprise with third party "crew leaders" who provide the illegal aliens for work on the farms.

108.   Each "crew leader" is paid a fee for each worker it supplies to Lipman, and those "crew leaders" work closely with Lipman to meet its employment needs.

109.   The "crew leaders" and Lipman share the common purpose of obtaining illegal workers for employment by Lipman. The enterprise has worked in this fashion continuously over at least the last five years.

110.   This association of Lipman and the "crew leaders" constitutes an association-in- fact enterprise pursuant to 18 U.S.C. § 1961(4).

111.   All predicate acts committed by the RICO Defendants are related and were committed with a common scheme in mind: to conceal, or attempt to conceal, the hiring, harboring, shielding and materially benefitting from the use of illegal aliens, and to silence Plaintiff from exposing the illegal conduct and the RICO Defendants' unlawful actions.

112.   Moreover, it was part of the RICO Defendants' common scheme to attempt to persuade Plaintiff in a corrupt manner not to expose the RICO Defendants' illegal racketeering activity and by engaging in overt acts in furtherance of the common scheme by excluding him from meetings, ridiculing him, threatening loss of employment and thereafter firing him from employment for his written objection to the practice of

hiring illegal aliens, and then conditionally offering him the opportunity to resign with six (6) month's salary and benefits if he agreed to a full release of claims against Lipman and to a confidentiality agreement whereby he would be precluded from exposing Lipman's illegal activity.

113.    The enterprise affects interstate commerce in that the illegal workers employed by Lipman travel in international and interstate commerce in order to reach Lipman facilities located throughout the United States.

114.    The enterprise also affects interstate commerce in that Lipman, a member of the enterprise, is directly engaged in the production, distribution and acquisition of goods and services in interstate commerce.

115.    Lipman accepted and retained the benefits of the acts of racketeering activity, thereby ratifying the conduct of its managers, employees, and the members of the enterprise who assisted it in committing those acts of racketeering activity.

116.    Bishop has suffered an injury to his "business or property," by reason of Bishop's termination at Lipman in furtherance of the common scheme of RICO Defendants to conceal or attempt to conceal the hiring and harboring of illegal aliens and as a direct result of RICO Defendants' violations of Federal RICO and Florida RICO.

117.    Lipman's unlawful conduct has allowed Lipman to earn or retain significant funds to which it is not entitled.   For example, Lipman's widespread employment of illegal workers has permitted Lipman to depress the wages for its hourly workers and to reduce the expenses it incurs as a result of worker's compensation claims. These savings contribute to Lipman's profit margins and provide the financial motive for

Lipman's hiring of illegal workers.

## COUNT ONE
## FLORIDA WHISTLEBLOWER STATUTE: LIPMAN

118.    The Plaintiff realleges and incorporates herein by reference each and every

allegation contained in Paragraphs 1 through 117 hereof.

119.    Defendant Lipman employs greater than ten (10) employees and is an

employer within the meaning and governance of the Whistleblower Act.

120.    All of the named Defendants and their affiliated companies operate as a

single business "Enterprise," combined activities performed for a common business

purpose, at one main establishment, operating under unified operation and common

control and engaged in commerce.

121.    On or about February 2, 2012, Bishop sent an email to Purse, CFO of

Lipman, and Parra, Human Resources Director at Lipman, objecting and refusing to

participate in Lipman's illegal practice, policy and activity of hiring and use of illegal

aliens in the farming labor.  The details of said email are laid out in paragraph 68.

122.    Moreover, in that same email, Bishop objected to the inappropriate

comments made to him by Shoemaker, where he called him "Tummy Bahama" and made

reference to his getting his attire from "Omar the Tentmaker."

123.    A mere two (2) business days later, Bishop was terminated by Lipman, in

violation of Florida's Whistleblower's Act, Florida Statute § 448.102, for his objection

and refusal to participate in the practices of Lipman's illegal practice, policy and activity

of hiring and use of illegal aliens in the farming labor.

124.    This practice, policy and activity violates multiple laws, rules, and

regulations, including but not limited to:

    a.  Fla. Stat. § 448.09;

    b.  8 U.S.C. § 1324(a)(3)(A);

    c.  8 U.S.C.  § l324(a)(l)(A)(iv);

    d.  8 U.S.C. § 1324(a)(1)(A)(iii);

    e.  8 U.S.C. § 1324(a)(1)(A)(v);

    f.  8 U.S.C. § 1324a(a);

    g.  18 U.S.C. § 1546; and

    h.  18 U.S.C. § 1961.

125.    Bishop suffered an adverse employment action by Lipman, as he was terminated within two (2) business days after emailing Lipman his concern regarding its illegal practice, policy and activity of hiring and use of illegal aliens in the farming labor.

126.    Lipman's actions caused Bishop to suffer serious financial and emotional harm.

127.    Lipman's actions terminating Bishop were malicious, extreme and outrageous, and intended to punish and harm Bishop for refusing to participate in their illegal practice, policy and activities.

**COUNT TWO**
**CIVIL CONSPIRACY: DEFENDANTS SHOEMAKER,**
**PURSE, WEISIGNER, AND PARRA**

128.    The Plaintiff realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 117 hereof.

129.     Defendants, Shoemaker, Purse, Weisinger and Parra, and other unknown co-conspirators (collectively "Conspiracy Defendants"), acting in concert, conspired and agreed to terminate Bishop in retaliation for his written objections to the illegal practice, policy and activities of Lipman.

130.     It was the object and purpose of the conspiracy to hide and conceal their past and continued unlawful conduct.

131.     As a direct result of the joint conduct and agreements between Conspiracy Defendants, Bishop's employment was terminated in violation of the Florida Whistleblower Statute.

132.     After terminating Bishop, Conspiracy Defendants, attempted to silence him by offering him a large monetary settlement agreement in the amount of Eighty-Four Thousand and 00/100 Dollars ($84,000).

133.     The agreement would preclude Bishop from disclosing his objections and concerns regarding Lipman illegal practices, policies and activities.

134.     Conspiracy Defendants acted maliciously and with the intention of retaliating against Bishop for his objecting to their unlawful conduct.

135.     As a direct and proximate result of the conspiracy Bishop suffered damages.

## COUNT THREE
## RICO VIOLATION - 18 U.S.C. § 1962(C): ALL DEFENDANTS

136.     Bishop realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 117 hereof.

137.     The foregoing conduct constitutes a violation of 18 U.S.C. § 1962(c).

138.     Bishop has been injured in his property by reason of Lipman's violations of 18 U.S.C. § 1962(c).

139.     The injuries suffered by Bishop were caused by Lipman's violations of 18 U.S.C. § 1962(c).

140.     Pursuant to 18 U.S.C. § 1964(c), Bishop is entitled to recover threefold the damages he has sustained and costs of suit, including reasonable attorney's fees.

## COUNT FOUR
## RICO VIOLATION - 18 U.S.C. § 1962(D):  ALL DEFENDANTS

141.     Bishop realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 117 hereof.

142.     The RICO Defendants, through an agreement to commit two or more predicate acts, conspired to conduct or participate in the conduct of an enterprise, Lipman, through a pattern of racketeering activity in violation of 18 U.S.C. § 1962(d).

143.     The actions of the RICO Defendants as against Bishop, and as described above, were in furtherance of the RICO Defendants' conspiracy and in violation of 18 U.S.C. § 1962(d).

144.     Lipman was and is the passive instrument of the RICO Defendants' racketeering activity and constitutes an "enterprise" as that term is defined in 18 U.S.C. § 1961(4), separate and distinct from the individual RICO Defendants named herein.

145.     The RICO Defendants, as well as others known or unknown, being persons employed by and associated with Lipman, which was and is engaged in the activities that affected and affect interstate commerce, unlawfully and knowingly conducted or participated, directly or indirectly, in the affairs of the enterprise through a pattern of racketeering activity, that is, through the commission of two or more racketeering acts set forth herein.

146.     Plaintiff seeks to prohibit the RICO Defendants from utilizing the pattern of unlawful conduct in which they have continually engaged during the relevant time period.

147.     As alleged with particularity above, the facts demonstrate that the RICO Defendants willingly and knowingly conducted or participated, directly or indirectly, in the conduct of Lipman's affairs through a pattern of racketeering activity.

148.     As alleged with particularity above, as a direct and proximate result of the RICO Defendants' aforementioned RICO conduct, Plaintiff's lawful employment and livelihood have been irreparably damaged.

149.     As alleged with particularity above, the RICO Defendants are jointly and severally liable to Plaintiff for treble damages, together with all costs for this action, plus reasonable attorneys' fees as provided by 18 U.S.C. § 1964.

150.     To the extent permitted by law, Plaintiff is entitled to damages, plus court costs, and pre and post-judgment interest at the legally allowable limit.

## COUNT FIVE
## FLORIDA RICO VIOLATION: ALL DEFENDANTS

151.     Bishop realleges and incorporates herein by reference each and every allegation contained in Paragraphs 1 through 117 hereof.

152.     This is an action for violations of the Florida Civil Remedies for Criminal Practices Act, Fla. Stat. § 772.101 et seq., also known as the Florida RICO Act.

153.     Fla. Stat. § 772.104 provides that any person who has been injured by reason of the provisions of § 772.103 shall have a [civil] cause of action for three fold actual damages and also for reasonable attorneys' fees and court costs through the trial and appellate courts.

154.    Fla. Stat. § 772.103 provides in pertinent part, that it is unlawful for any person:

(1) who has with criminal intent received any proceeds derived, directly or indirectly, from a pattern of criminal activity to use or invest, whether directly or indirectly, any part of such proceeds, or the proceeds derived from the investment or use thereof, in the acquisition of any title to, or any right, interest, or equity in, real property or in the establishment or operation of any enterprise;

(2) through a pattern of criminal activity, acquired or maintained, directly or indirectly, any interest in or control of any enterprise or real property

(3) employed by, or associated with, any enterprise to conduct or participate, directly or indirectly, in such enterprise through a pattern of criminal activity;

(4) to conspire or endeavor to violate any of the provisions of subsections (1), (2), or (3)

155.    Defendants, through their predicate acts and pattern of criminal activity as laid out in paragraphs 75-117, violated Fla. Stat. §§ 772.103(2) and (3) and these violations directly and proximately caused injury to Bishop.

156.    Moreover, the RICO Defendants also conspired and endeavored to violate the activities prohibited by Fla. Stat. § 772.103, in violation of § 772.104(4).

## **PRAYER FOR RELIEF**

WHEREFORE, Bishop requests that the Court:

a.   enter judgment in his favor and against all the Defendants, jointly and severally;

b.   award treble the amount of all wages and benefits Plaintiff would have received but for Defendants' unlawful conduct, including but not limited to back pay, front pay, and pre-judgment interest;

c.  compensatory damages in an amount to be determined at trial to compensate Plaintiff for the damage to reputation, loss of career, humiliation, anguish and emotional distress caused by the Defendants' unlawful conduct;

d.  punitive damages;

e.  costs of suit, reasonable attorneys' fees, interest;

f.  a preliminary and permanent injunction against the Defendants from perpetrating further racketeering activity pursuant to 18 U.S.C. § 1964(c)-(d) and Fla. Stat. § 772.104;

g.  a jury trial; and

h.  and other such relief the Court may consider just and proper.

Dated: October 10, 2012

/s/ Richard J. Swift
Richard J. Swift
Florida Bar #584861
rswift@garlaw.com
Trial Counsel

Shaun M. Garry
Florida Bar #93412
sgarry@garlaw.com

Attorneys for Plaintiff, BRIAN BISHOP
Garlick, Hilfiker, & Swift, LLP
9115 Corsea del Fontana Way, Suite 100
Naples, Florida 34109
(239) 597-7088 – telephone
(239) 597-6984 - fax