IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA

FORT MYERS DIVISION

BRIAN BISHOP,

     **Plaintiff,**

     v.

**LIPMAN AND LIPMAN, INC., LFC
ENTERPRISES, INC., LFC
AGRICULTURAL SERVICES, INC., FARM
OP, INC., LFC MANAGEMENT
SERVICES, INC., ROBERT KENT
SHOEMAKER JR., LARRY LIPMAN,
TOBY PURSE, JAMIE WILLIAMS, MAX
JAIME WEISINGER, AND HERNAN
PARRA,**

     Defendants.

CIVIL ACTION

Case No. 2:12-CV-562-JES-DNF

## PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS II, III, IV, AND V OF THE COMPLAINT AND SUPPORTING MEMORANDUM OF LAW

Plaintiff, BRIAN BISHOP, ("Bishop"), by and through his attorneys, Garlick, Hilfiker & Swift, LLP, hereby responds to Defendants' Motion to Dismiss Counts II, III, IV and V of the Complaint and Supporting Memorandum of Law ("Motion") filed by Defendants, LIPMAN AND LIPMAN, INC., LFC ENTERPRISES, INC., LFC AGRICULTURAL SERVICES, INC., FARM OP, INC., LFC MANAGEMENT SERVICES, INC., ROBERT KENT SHOEMAKER JR., LARRY LIPMAN, TOBY PURSE, JAMIE WILLIAMS, MAX JAIME WEISINGER, and HERNAN PARRA (collectively, "Defendants"), and states:

# INTRODUCTION

The Defendants paint too broad a stroke in their arguments against RICO liability under 1962 (c) and in doing so simply miss the mark.[1] It is apparent the Defendants endeavor to paint this case as merely another Plaintiff attempting to stretch RICO beyond its breaking point; however, the Defendants fail to address the fact that the firing of Brian Bishop and the attempted cover-up was not merely a "retaliatory firing" but conduct that gives rise to liability under the Immigration and Nationality Act ("Act") and thus is readily distinguishable from cases where a Plaintiff complained of harm flowing from "misfortunes" visited upon a third party. In this case, the firing of Bishop was part of Lipman's employing, concealing and harboring of illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(iii) and/or is part of the conspiracy to employ, conceal, and harbor illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(A)(v). The Defendants also challenge Count II, the civil conspiracy count, on the basis of the intracorporate doctrine. The Defendants' position, contrary to law and authority, is that they were acting within the scope of their employment by hiring and concealing illegal aliens, and then terminating Bishop in an attempt to cover up their illegal activity. This position is simply untenable. Not only does the intracorporate doctrine not apply for a conspiracy to conduct serious criminal activity (even though it may be achieved by non-criminal means), the Complaint alleges that so called "crew leaders" who were not employees of Lipman, conspired with the named Defendants to provide illegal farming labor to Lipman, thus eliminating the applicability of the intracorporate doctrine.

---

[1] The suggestion that this Complaint is about the depression of wages earned by Bishop is merely a straw man argument. Bishop readily agrees with the Defendants that he was not an hourly employee whose wages were depressed due to the hiring of illegal aliens at Lipman.

## BRIEF FACTUAL OVERVIEW

Lipman,[2] the United States largest open field tomato grower, has seasonal farming operations in Florida, South Carolina, Virginia and California that requires a large farming work force to harvest and plant the tomatoes. ¶¶18-19.[3] In order to provide this work force for the open field farming operations, Lipman uses so called "crew leaders" to find and put together a farming crew for each season. ¶¶22, 26. These "crew leaders" are paid based on their ability to provide sufficient numbers of farming laborers for each season. ¶27. Notably, the farming laborers are paid and "registered" by Lipman and not the crew leaders. ¶27. The farming laborers are provided housing near the farming facilities by Lipman and transportation to and from the Lipman farms. ¶¶28, 29. Lipman has no method at the farms to verify that the farming laborer, who was registered at the beginning of the farming season, is in fact the individual who was working at the farm on that day. ¶33. This is unlike Lipman's packing houses which use biometric scanning to verify that the registered individual is working at the packing house. ¶¶30-32.

Bishop was hired in 1997 as an Information Technology Manager at Lipman, whose responsibilities included overseeing, managing, and deploying all computer related and information technology at Lipman. ¶¶35-36. Over Bishop's fourteen (14) year employment

---

[2] The Complaint defines "Lipman" as: Lipman and Lipman, Inc., LFC Enterprises, Inc., LFC Agricultural Services Inc., Farm Op., Inc, and LFC Management Services because all the entities are interrelated companies or subsidiaries of each other that each of the named Defendants managed or participated in the management thereof. At this stage, the Plaintiff is simply unable to untangle the corporate structure to apportion liability, vicarious or otherwise, among the different corporate entities with respect to the challenged counts as they are closely held private companies. Moreover, the Defendants' Motion does not challenge the individual liability of any of the Defendants, named or otherwise, with respect to the Counts. Therefore, for simplicity, Bishop will refer to these entities through this response as "Lipman."

[3] Specific citations in the Complaint will be referred to "¶X" or "¶¶X,X" where X will stand for the corresponding paragraph(s) in the Complaint.

at Lipman, during which he was elevated to the position of Chief Information Officer ("CIO"), he implemented biometric scanning at the packing houses and pushed the company to implement similar technology in the farming operation so Lipman could reduce its illegal labor force. Bishop learned about this illegal labor force through his employment at Lipman. ¶¶36, 43, 46. Specifically, Bishop was privy to admissions by Lipman's officers and/or directors that demonstrated their knowledge of the use of illegal aliens at Lipman, including:

1. A disclosure at an operations meeting by Larry Lipman that Lipman would "rather pay fines than takes steps to be in compliance with the law" with respect to submitting social security numbers that matched the names of the employees. ¶¶47-48.

2. At another operations meeting regarding a potential labor shortage in the farms, Lipman's Labor Manager David Garcia, indicated that the crew leaders were going to have to use so called "coyotes" to supply the additional needed farming laborers. Bishop would later find out that a coyote is an individual who smuggles illegal migrant workers into the United States from Mexico for money. ¶¶49-51.

3. An admission during an administrative meeting by Jamie Weisinger, a member of the board of directors of Lipman, that "half of our employees are legal, but the other half – not so much." ¶¶55-56.

4. An admission by Jamie Williams, Lipman's Director of Farming, regarding the tracking of farming laborers that "I don't care if they are legal – I just need warm bodies. I don't care where they are from, I don't care if their brother is punching in for them – I just need people to harvest." ¶¶58-60.

5. After an H-2A meeting that Bishop attended, he spoke with David Garcia, who told Bishop in words and substance that the percentage of illegal workers to legal workers at Lipman was greater than 60%. ¶¶70-74.

By employing illegal aliens in its farming labor, Lipman is able to significantly reduce the high labor costs that they would otherwise incur through open field farming with legal labor. ¶¶ 87, 117. By reducing these labor costs, Lipman is able to create very large profits that are passed on to its officers and directors. Id.

Bishop became increasingly concerned about the use of "crew leaders" and the use of illegal laborers at the farms, when two of Lipman's crew leaders were convicted of federal crimes for enslaving and abusing nine (9) illegal aliens that worked on Lipman's farming fields. ¶52. Moreover, Bishop constantly pushed Lipman to implement new technologies at its farms to reduce the use of illegal aliens in its farming operations. ¶¶53, 57. As Bishop became more and more vocal regarding Lipman's use of illegal aliens and its failure to implement technologies to reduce that illegal workforce, Lipman began to systematically exclude him from meetings that directly involved his department and he was subject to public ridicule by Shoemaker, the new CEO of Lipman. ¶68.

On February 2, 2012, Bishop sent an email to Lipman's Chief Financial Officer and Chief of Human Resources where Bishop stated that he believed that Lipman was not "doing the right thing" with respect to their illegal force and that Lipman was purposefully ignoring new technological methods for reducing that illegal force on their farms. ¶75. After sending that email, Bishop received a call from Weisinger, who said "What are you doing? Trying to get fired?" and "Why can't people just go away." ¶¶76-78. Bishop understood this phone call as a threat and an attempt to coerce him into keeping silent regarding Lipman's illegal practices. Id. Only two (2) business days later, Bishop was terminated and offered a confidential settlement whereby he would be paid $84,000.00 to keep silent regarding his concerns over Lipman's hiring and use of illegal aliens. ¶¶83-84, 97-98, 111, 112, 116, 117.

### STANDARD FOR A MOTION TO DISMISS

In deciding a motion to dismiss, the Court must accept all well-pleaded factual allegations in a complaint as true and take them in the light most favorable to plaintiff.

*Erickson v. Pardus*, 551 U.S. 89, 94 (2007). A complaint must state a "plausible" but not "probable" claim for relief. *James River Ins. Co. v. Ground Down Eng'g, Inc.*, 540 F.3d 1270, 1274 (11th Cir. 2008) (*citing Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555-56(2007)). The determination of whether a complaint adequately states a plausible claim is a "context-specific task," in which the factual allegations of the complaint must be examined to assess whether they are sufficient "to raise a right to relief above the speculative level." *Twombly* at 555. To satisfy this standard, a plaintiff need not "forecast" evidence sufficient to prove the elements of the claim. *Robertson v. Sea Pines Real Estate Cos.*, 679 F.3d 278, 291 (4th Cir. S.C. 2012) ("The requirement of nonconclusory factual detail at the pleading stage is tempered by the recognition that a plaintiff may only have so much information at his disposal at the outset.")

In a footnote, the Defendants incorrectly suggest that all RICO complaints are subject to the heightened pleading standard of Federal Rule of Civil Procedure 9(b), citing *Leviton v. Patti*, 2011 U.S. Dist. LEXIS 34979, *18 (N.D. Fla. Feb 8, 2011), which in turn cites *Brooks v. Blue Cross/Blue Shield of Fla., Inc.* 116 F.3d 1364 (11th Cir. 1997). *See Defs' Mot.* at 2, n1. *Leviton* and *Brooks* stand for the narrower proposition that when pleading RICO conduct based on fraud (such as wire and mail fraud), the complaint must comply with Rule 9(b), *Brooks* at 1380-81; however, when RICO conduct is not based on fraud, such as the illegal conduct alleged in this Complaint, the pleadings are not subject to Rule 9(b). *See e.g.*, *Magnifico v. Villanueva, 783 F. Supp. 2d 1217, 1227, n.7 (S.D. Fla. 2011)* (only applying the heightened pleading of Rule 9(b) to RICO acts that are based on fraud).[4]

---

[4] Bishop notes that even if this Court were to apply the heightened pleading standard of Rule 9(b), the 27 page Complaint meets this standard by detailing the who, what, where, and when, to the extent practical at this stage in the case.

## RICO

Pursuant to 18 U.S.C. § 1962(c), it is illegal "for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity . . . ." 18 U.S.C. § 1962(c). Thus, in order to establish a federal civil RICO violation under § 1962(c), the plaintiffs "must satisfy four elements of proof: '(1) conduct (2) of an enterprise[5] (3) through a pattern (4) of racketeering activity.'" *Jones v. Childers*, 18 F.3d 899, 910 (11th Cir. 1994) (*quoting Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 496, 105 S. Ct. 3275, 3285, 87 L. Ed. 2d 346 (1985)). In a civil case, the Plaintiff must also show injury to "business or property," by reason of the substantive RICO violation. *Id.*

The Plaintiff only addresses the Federal RICO Counts as the Defendants' challenge to Bishop's Florida RICO Violations, Count V, is based wholly on the argument that "[b]ecause the Plaintiff's federal RICO claims fail, his Florida RICO Act claims also necessarily fail as a matter of law . . . ." *Defs' Mot.* at 15. Because Bishop's Federal RICO claims do not fail as a matter of law, neither does his Florida RICO Act Count.

### THE ALLEGED RICO ACTS IN THIS CASE

The Complaint alleges predicate RICO acts based on violations of the Act. *See* 18 U.S.C. 1961 (1) (" 'racketeering activity' . . . means any act which is indictable under any of

---

[5] The Defendants properly make no challenge that the conduct alleged in the Complaint is sufficient to be considered the "conduct of an enterprise" in this circuit for purposes of RICO. *See Williams v. Mohawk*, 465 F.3d 1277, 1284-1285 (holding that allegations that Mohawk and third-party temp agencies/recruiters conspired to violate federal immigration laws, destroy documentation, and harbor illegal workers, with the common purpose of the reduction in wages, was sufficient for RICO pleading). *See also* ¶¶26-29, 49-52, 87, 107-117.

the following provisions of title 18, United States Code: . . . any act which is indictable under the Immigration and Nationality Act, section 274 (relating to bringing in and harboring certain aliens).")  As outlined in the Complaint, the common purpose of this enterprise[6] was to employ, harbor, and conceal illegal aliens in the farming operations at Lipman in order to reduce costs and to increase profit margins for Lipman's open field farming.  ¶¶111, 117.  To achieve this purpose, the Defendants engaged in the following predicate RICO acts:

1) The hiring of more than (10) aliens per year for the last four years, knowing that the individuals are aliens, in violation of 8 U.S.C. § 1324(a)(3)(A).  ¶¶93-94.

2) The concealing, harboring and shielding from detection aliens who have entered into the U.S. illegally, in violation of 8 U.S.C. § 1324(a)(I)(A)(iii).  ¶¶95-96.

3) The encouraging and inducing an alien to enter or reside in the United States, with knowing or in reckless disregard of the fact that it is violation of the law, in violation of 8 U.S.C. § 1324(a)(1)(A)(iv).  ¶97.

4) The engaging in a conspiracy to commit or aiding and abetting any of the violations outlined in 1, 2, or 3.  8 U.S.C. § 1324 (a)(1)(A)(v).  ¶98.

The Defendants limits their argument to the requirement of proximate and direct cause under RICO.  *See Defs' Mot*. At 7-12.  Additionally, there is little question that the harm suffered by Bishop was the loss of his employment at Lipman;[7] therefore, the only issue properly before the Court with respect to Count III is whether or not Bishop's loss of employment from Lipman was proximately and directly caused by a predicate RICO violation.

---

[6] Similar to Mohawk, the individuals named in the Complaint received large yearly bonuses and/or profits that could not have been achieved with legal farming labor.  ¶87.

[7] To "demonstrate injury for RICO purposes, plaintiffs must show proof of concrete financial loss." *Regions Bank v. J.R. Oil Co.*, 387 F.3d 721, 728-29 (8th Cir. 2004).  The Complaint alleges in detail Bishop's loss of employment, which demonstrates concrete proof of financial loss.  ¶¶37, 39, 81-84.

## BISHOP'S LOSS OF EMPLOYMENT WAS DIRECTLY AND PROXIMATELY CAUSED BY RELATED PREDICATE RICO CONDUCT

Under RICO, a wrongful act is "a proximate cause if it is a substantial factor in the sequence of responsible causation" and it need not be the only cause. *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386, 1399 (11th Cir. 1994). *See also* W. PAGE KEETON ET AL., PROSSER AND KEETON ON THE LAW OF TORTS § 41, at 268 (5th ed. 1984) ("If the defendant's conduct was a substantial factor in causing the plaintiff's injury, it follows that he will not be absolved from liability merely because other causes have contributed to the result, since such causes, innumerable, are always present.") Moreover, the standing requirement, or the so called "direct injury requirement," is not an inquiry of foreseeability, but is solely limited to whether the alleged injury was directly caused by the RICO violation. *Bivens Gardens Office Bldg., Inc. v. Barnett Banks of Fla., Inc.*, 140 F.3d 898, 908 (11th Cir. 1998). To meet this test, the plaintiffs must show a "direct relation between the injury asserted and the injurious conduct alleged." *Holmes*, 503 U.S. at 268.

In order to discuss whether or not the harm caused to Bishop is proximately and directly related to the predicate RICO acts, Bishop first lays out for the Court the RICO offenses that relate to the loss of Bishop's employment.[8]

---

[8] The Defendants completely ignore the vast majority of the predicate RICO acts alleged in the Complaint and attempt to bury them in a footnote, even though the Complaint directly connects the predicate RICO acts to the termination of Bishop. *See Defs' Mot. To Dismiss* at 9, n.4. *See also* ¶¶95, 98, 111. For example, the Defendants suggest that "the termination of Plaintiff's employment is not directly related to, and as a matter of law is not the proximate cause of, the alleged hiring of illegal workers in order to depress labor costs related to legal farm laborers." *Defs' Mot. To Dismiss* at 11. This assertion ignores the allegations in the Complaint related to 8 U.S.C. § 1324(A)(I)(A)(iii) and 8 U.S.C. § 1324(A)(I)(A)(v) that relate to the concealing, harboring, and shielding of illegal aliens at Lipman.

It is a Federal crime to conceal, harbor, or shield an alien with knowledge or with reckless disregard of the fact that the alien entered in the United States illegally.[9]  *See* 11TH CIRCUIT PATTERN JURY INSTRUCTIONS CRIMINAL CASES (2010) § 96.3.  To conceal, harbor, or shield from detection includes knowingly doing something to help the alien escape detection. *Id*.  Employers who shield illegal alien employees from detection can be guilty of violating 8 U.S.C. § 1324(A)(I)(A)(iii).  *See Edwards v. Prime Inc.*, 602 F.3d 1283 (11th Cir. 2010) and *United States v. Khanani*, 502 F.3d 1281, 1294 (11th Cir. 2007).  *See also United States v. Rubio-Gonzalez*, 674 F.2d 1067, 1072 (5th Cir. 1982).  The 11th Circuit has broadly interpreted the statute, finding that the mere "… knowingly or recklessly hiring illegal aliens probably is enough by itself to constitute concealing, harboring, or shielding from detection for purposes of the statute."  *Edwards* at 1298.  Additionally, the Court has interpreted "harboring" as the general facilitating of an alien's presence in the United States.  *United States v. Chang Qin Zheng*, 306 F.3d 1080 (11th Cir. 2002).

The harboring, shielding or concealing conduct need not be the "but for" causation of the illegal alien remaining in the United States.  *United States v. Shiu Sun Shum*, 496 F.3d 390, 392 (5th Cir. Tex. 2007).   The test is whether or not the conduct makes the alien's illegal presence in the United States "substantially easier or less difficult."  *Id*.  The Court need not determine whether or not the conduct as alleged would constitute principal or accomplice liability under this statute, as both are predicate acts under RICO.  *See United States v.*

---

[9] The Complaint lays out the factual basis, through statements and admissions of its officers and/or directors, that Lipman knowingly or with reckless disregard employed illegal aliens in its farming operations. See ¶¶ 47-48, 49-51, 42, 55-56, 58-60, 70-74.

*Garcia*, 400 F.3d 816, 819-20 (9th Cir. 2005) (holding that a jury may convict without reaching a unanimous decision as to the defendant's role – whether he was a principal or an aider or abettor). *See* 8 U.S.C. § 1324(A)(I)(A)(v).

Lipman's liability under 8 U.S.C. § 1324(A)(I)(A)(iii), as alleged in the Complaint, is based on a course of conduct whereby they not only knowingly hired illegal aliens, but provided transportation and housing to the illegal aliens to avoid detection, and then fired Bishop and offered him a confidential settlement in an effort to prevent him from disclosing his knowledge regarding the use of illegal aliens at Lipman's farming operations. By Lipman providing housing to the illegal aliens, it makes it "substantially easier" for illegal alien workers to avoid detection by the authorities, as they do not have to provide documentation, such as credit checks based on social security numbers that are customarily required to lease or purchase a property. Moreover, by providing transportation to and from Lipman housing to its farms, it creates a substantially lower risk of detection by authorities because the illegal aliens do not have to register, purchase or operate any vehicles on public roads.

The termination of Bishop at Lipman and attempted cover-up through the confidential settlement[10] was also part of the conduct that constitutes substantial assistance in preventing the detection of illegal aliens by Lipman. Bishop knew that Lipman used illegal aliens in its workforce, and was in a position as the CIO of Lipman to expose their illegal practice or

---

[10] Even if the Court were to find that the conduct alleged could not itself not be considered a primary violation of concealing, harboring, or shielding in violation 8 U.S.C. § 1324(a)(I)(A)(iii) because Bishop did not in fact enter into the confidential agreement, then Lipman's termination and attempted cover-up of Bishop was aiding and abetting conduct with respect to Lipman's violation of 8 U.S.C. § 1324(a)(I)(A)(iii) as they took an act, that is the offering of the confidential settlement for $84,000 after firing Bishop, that contributed and furthered the substantive offenses. As discussed above, it makes no difference whether or not the conduct as alleged would constitute principal or aiding and abetting liability under either statute.

make it very difficult for Lipman to use illegal aliens in its workforce through the implementation of new technology. Bishop repeatedly urged Lipman's officers to use biometric scanning in its farming operations to ensure that only legal, registered workers were employed, but he was ignored. When Bishop put his concerns in writing over Lipman's practice of hiring of illegal aliens to the CFO and the Director of Human Resources, he was fired and simultaneously offered a confidential settlement that would have prevented him from disclosing his knowledge of the use of illegal aliens at Lipman in return for $84,000. Essentially, Lipman offered Bishop $84,000 to keep quiet regarding Lipman's hiring and use of illegal aliens in its farming operation. This is the very definition of harboring (or attempted harboring) under the 11th Circuit's broad interpretation of the statute, as it made it substantially easier for the illegal aliens employed by Lipman to remain in the United States by eliminating (or attempting to eliminate) the threat of exposure by Bishop.

*THE TERMINATION OF BISHOP WAS IN*
*VIOLATION OF 8 U.S.C. § 1324(A)(I)(A)(V) (CONSPIRACY)*

Even if the Court were to find that the conduct could not be considered shielding, concealing or harboring an illegal alien, it was an overt act in furtherance of the conspiracy to employ, harbor, and conceal illegal aliens in violation of 8 U.S.C. § 1324(a)(I)(A)(v) by Lipman. To prove a criminal conspiracy, "the Government must prove (1) that an agreement existed between two or more persons to commit a crime; (2) that the defendant knowingly and voluntarily joined or participated in the conspiracy; and (3) a conspirator performed an overt act in furtherance of the agreement." *United States v. Ndiaye*, 434 F.3d 1270, 1294 (11th Cir. 2006). Individuals who are convicted of conspiracy to harbor illegal aliens in violation of 8 U.S.C. § 1324(a)(I)(A)(v) are liable for all substantive offenses of the co-conspirators that are

reasonably foreseeable and in furtherance of the conspiracy.  *United States v. Bonetti*, 277 F.3d 441 (4th Cir. 2002).  *See also Pinkerton v. United States*, 328 U.S. 640, 645-48 (holding that a co-conspirator could be guilty of a substantive offense even though he did no more than join the conspiracy, provided that the offense was reasonably foreseeable and was committed in furtherance of the conspiracy).

The conspiracy at issue is the employing,[11] harboring and concealing of illegal aliens by Lipman, the named individual defendants, and other unknown co-conspirators (such as the crew leaders) for the purposes of reducing the labor costs in the farming operations at Lipman.  Bishop was terminated in furtherance of this conspiracy, as he posed a significant threat of exposure of the conspiracy.  *See e.g., DeGuelle v. Camilli*, 664 F.3d 192, 205 (7th Cir. Wis. 2011).  It is important to note that Congress specifically considered conspiracy as predicate RICO conduct in this context and not simply a § 1962(d) violation.[12]  It is axiomatic that the underlying crime in a conspiracy need not be committed for conspiracy liability to attach; thus, Congress evinced a strong intent for conduct that may not be a direct violation of the Act to be a predicate RICO act, so long as it was a part of the conspiracy to violate the Act.  Importantly, conspiracy includes an agreement to conceal the defendants' crime if such acts of concealment are "done in furtherance of the main criminal objectives of the conspiracy." *DeGuelle v. Camilli*, 664 F.3d 192, 205 (7th Cir. Wis. 2011) (*quoting Grunewald v. United States*, 353 U.S. 391, 405, 77 S. Ct. 963, 1 L. Ed. 2d 931 (1957).  As alleged in the

_____

[11] The employing of known illegal aliens is violation of both 8 U.S.C. § 1324(a)(3)(A) and 8 U.S.C. § 1324(a)(I)(A)(iii), as under the 11th Circuit precedent,  "[t]he … knowingly or recklessly hiring illegal aliens probably is enough by itself to constitute concealing, harboring, or shielding from detection for purposes of the statute." *Edwards v. Prime Inc.*, 602 F.3d 1276, 1298 (11th Cir. Ala. 2010)

[12] This is unlike other RICO statutes that have specifically excluded certain portions of a criminal

-13-

Complaint, the conspiracy is on-going and will not stop without judicial intervention, ¶¶104-105, and the termination of Bishop was to conceal the conspiracy.

The Supreme Court also strongly implied in *Beck v. Prupis*, 529 U.S. 494 (2000), that the termination of an employee as an overt act in furtherance of conspiracy would be a RICO predicate act, if the overt act itself constituted "racketeering activity," as it does in this case under 8 U.S.C. § 1324(a)(I)(A)(v). Importantly, the Court in *Prupis* did not find that the termination of an employee in furtherance of a conspiracy could not be considered a related predicate act, only that the act in furtherance of the conspiracy must be an enumerated RICO predicate act, such as the conduct in this case. *Id.*

Moreover, as recently demonstrated in *DeGuelle v. Camilli*, 664 F.3d 192 (7th Cir. Wis. 2011), a retaliatory firing based on an employee's objection to an illegal practice, a RICO predicate act under Sarbanes-Oxley, was held to be related to the RICO tax fraud scheme. In that case, DeGuelle, an employee of S.C. Johnson & Son, Inc., was terminated after reporting an alleged tax fraud scheme to upper management and federal law enforcement agencies. *Id.* at 192-200. Prior to DeGuelle's termination, he was offered the opportunity to resign with one year of salary and benefits if he signed a confidentiality agreement and released all claims against S.C. Johnson & Son, Inc. - an offer that DeGuelle refused. *Id.* The Court held that the termination of DeGuelle was a related predicate act[13] to the tax fraud because "the underlying motivation was to retaliate against DeGuelle *for disclosing to the tax scheme*." *Id* at 201. Similar to the termination in *DeGuelle*, Bishop was terminated for

---

statute from the definition of racketeering activity.

[13] The Court reasoned that § 1513(e) and (f) of the Sarbanes-Oxley Act, made it illegal for an employer

objecting to Lipman's employment of illegal aliens, which is the underlying RICO conduct in this case. Moreover, Bishop's termination was a predicate RICO act under the Act in violation of 8 U.S.C. § 1324(a)(I)(A)(iii) and (v), similar to the circumstances of the termination in *DeGuelle*. Thus, Bishop's termination should be considered a related predicate RICO act in furtherance of the conspiracy to employ, harbor, and conceal illegal aliens at Lipman.

## *CONCLUSION*

The harm here, the loss of Bishop's employment, was the direct and proximate result of the Lipman's violation of the Act. Specifically, the termination of Bishop and the attempted cover-up that followed, was part of the conduct that constitutes a violation under 8 U.S.C. § 1324(a)(I)(A)(iii), or in the alternative, a violation under 8 U.S.C. § 1324 (a)(1)(A)(v) as aiding and abetting and/or as part of a conspiracy to employ, harbor, and conceal illegal aliens in Lipman's farming operations. Because the harm here is directly caused by the RICO violations, and was unquestionably a "substantial factor in the sequence of responsible causation," the Defendants' challenge to Count III must fail.

### THE DEFENDANT'S CHALLENGE TO THE RICO CONSPIRACY UNDER *§ 1962(D)* MUST FAIL BECAUSE BISHOP HAS PROPERLY ALLEGED A VIOLATION UNDER § 1962(C)

"[T]he touchstone of liability under § 1962(d) is an agreement to participate in an endeavor which, if completed, would constitute a violation of the substantive statute." *Goren v. New Vision Int'l, Inc., 156 F.3d 721, 732 (7th Cir. 1998)*. The defendant need not personally commit a predicate act; rather, a plaintiff must allege that the defendant agreed that

---

to retaliate against an individual for providing truthful information law enforcement agencies. *Id*. at 200.

*someone* would commit at least two predicate acts in furtherance of the conspiracy. *See Lachmund v. ADM Investor Servs., Inc., 191 F.3d 777, 784 (7th Cir. 1999).*

The Defendants challenge to Bishop's § 1962(d) claim is based on their argument that no substantive violation exists under § 1962(c), thus the count must be dismissed. As discussed in great detail in the proceeding argument, a substantive violation of RICO exists under 8 U.S.C. § 1324(A)(I)(A)(iii) and/or (v). Therefore, the Defendants' challenge to Count IV on that basis must fail. Moreover, the Supreme Court held in *Beck* that a § 1962(d) claim may survive so long as the underlying overt act in furtherance of the conspiracy would be considered racketeering activity. 529 U.S. 494, 500, 506 (2000). Therefore, in this case, the firing of Bishop could still give rise to liability under § 1962(d), regardless of a liability under § 1962(c), as the termination of Bishop was a RICO predicate act.

### THE CIVIL CONSPIRACY COUNT IS NOT BARRED BY THE INTRACORPORATE DOCTRINE

Common law conspiracy requires that there be "…an agreement between two or more people to achieve an illegal objective, an overt act in furtherance of the illegal objective, and a resulting injury to plaintiff." *McAndrew v. Lockheed Martin Corp., 206 F.3d 1031, 1036* (11th Cir. 2000). The Defendants' challenge to this Count fails because the intracorporate doctrine does not apply to the allegations in the Complaint.

#### *THE INTRACORPORATE DOCTRINE DOES NOT APPLY BECAUSE THE COMPLAINT ALLEGES THE CONSPIRACY INVOLVED INDIVIDUALS THAT ARE NOT EMPLOYED BY LIPMAN*

Defendants' erroneously contend that Bishop only alleges a cause of action against the executives of the same organization, Lipman, and thus, Bishop is barred under the intracorporate conspiracy doctrine. *Defs' Mot.* at 4. The intracorporate conspiracy doctrine holds that a "corporation cannot conspire with its employees, and its employees, when acting

within the scope of employment, cannot conspire among themselves." *McAndrew at* 1036 (11th Cir. 2000). Accordingly, the intracorporate conspiracy doctrine cannot bar as a matter of law conspiracy claims between two or more parties where at least one party is a third party separate from the corporation itself. Bishop alleged in the Complaint that third party "crew leaders" are an integral part of a conspiracy to employ, harbor, and conceal illegal aliens and recruit illegal workers for employment by Lipman. ¶¶26-29, 107-109. Crew leaders are paid a fee by Lipman for each worker it supplies to Lipman. ¶108. These facts establish a conspiracy with independent third parties other than employees at Lipman that precludes the applicability of the intracorporate doctrine.

Furthermore, Bishop defined the conspiracy Defendants in the Complaint as Shoemaker, Purse, Weisinger and Parra (executives at Lipman), *and other unknown co-conspirators*. ¶129. (emphasis supplied). The conspiracy is not limited to the named executives at Lipman but rather other unknown co-conspirators as well. It should also be noted that Bishop is not required to sue all co-conspirators and may choose to proceed against less than all or even just one co-conspirator for damages. *See Homeco Dev. v. Markborough Properties, Ltd.*, 709 F. Supp. 1137 (S.D. Fla. 1989). Thus, the intracorporate conspiracy doctrine is inapplicable as the allegations in Bishop's Complaint sufficiently allege that other third parties are involved in the conspiracy and the conspiracy is not limited solely to employees at Lipman.

### THE INTRACORPORATE DOCTRINE DOES NOT APPLY BECAUSE THE COMPLAINT ALLEGES A CRIMINAL CONSPIRACY

Even if this Court determines that Bishop has only alleged a conspiracy against the executives at Lipman, the intracorporate conspiracy doctrine still fails as a matter of law.

Criminal conspiracies are exempt from the intracorporate conspiracy doctrine. *See United States v. Hartley*, 678 F.2d 961 (11th Cir. 1982). The criminal conspiracy exception applies not only in criminal cases, but also in civil cases where a criminal conspiracy is alleged. *McAndrew* at 1036. Bishop alleges a criminal conspiracy to employ, harbor, and conceal illegal aliens in the farming operations at Lipman in order to reduce costs and to increase profit margins in violation of the Act. ¶¶ 98, 111 and 117.[14]

The firing of Bishop was the direct result of Defendants' conspiracy to employ, harbor, and conceal illegal aliens on its farming operations and to prevent Bishop from revealing the illegal operations in furtherance of the criminal conspiracy. "In situations where a criminal conspiracy is alleged, the action by an incorporated collection of individuals creates the 'group danger' at which conspiracy liability is aimed, and the view of the corporation as a single legal actor becomes a fiction without a purpose". *Battiste v. Broward Sheriff Kenneth C. Jenee, II*, 2006 U.S. Dist. Lexis 83248(S.D. Fla Nov. 15, 2006). "The fiction was never intended to prohibit the imposition of criminal liability by allowing a corporation or its agents to hide behind the identity of the other." *McAndrew* at 1039. The criminal conspiracy alleged by Bishop bars the applicability of the intracorporate conspiracy doctrine and prevents such acts from shielding the corporation and its agents from criminal wrongdoing and civil liability.[15] *Id. See also Kirwin v. Price Comm. Corp. et al*, 391 F.3d

---

[14] The Act provides that any person conspiring to commit any of the crimes under 8 U.S.C. §1324(a)(1)(A)(i) through (v) for financial gain is punishable by 10-year statutory maximum penalties per offense. Any person who aids and abets another in the commission of the offenses enumerated thereunder is subject to 5-year statutory maximum penalties per offense. See 8 U.S.C. § 1324(a)(1)(B).

[15] Additionally, when the illegal activity is seriously criminal, the activity is outside the scope of employment. See Restatement (Second) of Agency §229(2)(j).[15] Bishop has alleged a criminal conspiracy in violation of the Act that contains federal felonies with significant penalties for engaging in such activity. *Infra*

-18-

1323, 2004 U.S. App. LEXIS 24840 (11th Cir. 2004) (finding criminal conspiracy alleged under the Racketeer Influenced and Corrupt Organizations, 18 U.S.C. § 1962(d) as an exception from the intracorporate conspiracy doctrine). Thus, Bishop has established a valid cause of action for civil conspiracy in Count II of Bishop's Complaint.

Furthermore, Defendants contend that an employee acting outside the scope of employment is an exception to the intracorporate conspiracy doctrine. *Defs' Mot.* at 5 and citing *Dickerson v. Alachua County Commission*, 200 F.3d 761, 767 (11th Cir. 2000). Outside the scope of employment is where an officer or an employee of the corporation has a "…personal stake in the illegal activities separate and distinct from that of the corporation*."* *Jewel Foliage Co. v. Uniflora Overseas Florida, Inc.,* 497 F. Supp 513, 518 (M.D. Fla. 1980) citing *Greenville Publishing Co., Inc. v. Daily Reflector, Inc*., 496 F.2d 391, 399 (4th Cir. 1974).[16] Bishop alleges that "[e]ach RICO Defendant directly benefited from the pattern of racketeering activity as they received large yearly bonuses and/or profits derived from use of cheap labor." ¶87. The Defendants erroneously contend that because the corporation and the Defendants share the same motive of making more money they are aligned and the employees' interest are not divergent from the corporation. However, the test to be employed is whether the employees had an independent personal or financial stake in the illegal activity to engage in the illegal activity distinct from the corporation. *Greenville* at 399.

---

note 16. The serious criminal nature of the allegations moves the conduct or actions of the Defendants outside the scope of employment and bars the applicability of the intracorporate conspiracy doctrine.

[16] In the *Greenville* case the 4th Circuit determined that defendant's deposition established that he was paid a commission for each advertisement sold and received a bonus once he reached a certain level of production and thus had an independent financial stake and would benefit from the conspiracy of the elimination of a local paper.

Bishop alleges the Defendants have an independent financial stake distinct from the corporation and are compensated with large yearly bonuses as a result of the profits achieved through the use of illegal labor. The fact that the parties have a common motive to make more money is irrelevant. The Defendants have independent financial motive by receiving large yearly bonuses based on the overall profits of the corporation versus being straight salaried employees who do not make any more or less based on the profits of the corporation. Thus, Defendants' independent financial stake to engage in the illegal activity is sufficient to overcome the intracorporate conspiracy doctrine and Bishop has stated a valid claim for civil conspiracy.

Thus, based on all of the forgoing, the Defendants' motion to dismiss as to Count II of the Complaint should be denied.

## CONCLUSION

For the reasons stated above, Bishop respectfully requests that the Court **DENY** the Defendants' Motion to Dismiss Counts II, III, IV, and V. To the extent that the Court grants the Defendants' Motion with respect to any Count, Bishop respectfully requests that the Court does so without prejudice.

/s/ Richard J. Swift      Attorneys for Plaintiff, BRIAN
Richard J. Swift        BISHOP
Florida Bar #584861      Garlick, Hilfiker, & Swift, LLP
rswift@garlaw.com       9115 Corsea del Fontana Way,
Trial Counsel          Suite 100
Shaun M. Garry        Naples, Florida 34109
Florida Bar #93412       (239) 597-7088 – telephone
sgarry@garlaw.com       (239) 597-6984 – fax

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 21st day of November, 2012, I electronically filed the foregoing document with the Clerk of Court by using the CM/ECF system. I also certify that the foregoing document is being served this day on all counsel of record or pro se parties identified below in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

Jonathan A. Beckerman, Esq.
Florida Bar No. 568252
E-mail: jabeckerman@littler.com
Elaine W. Keyser, Esq.
E-mail: ekeyser@littler.com
Florida Bar No. 13606
Littler Mendelson, P.C.
One Biscayne Tower
2 South Biscayne Blvd. Ste. 1500
Miami, Florida 33131
Tel: (305) 400-7500
Fax: (305) 603-2552

/s/ Shaun M. Garry
Shaun M. Garry
Florida Bar #93412
sgarry@garlaw.com

Attorney for Plaintiff, BRIAN
BISHOP
Garlick, Hilfiker, & Swift, LLP
9115 Corsea del Fontana Way,
Suite 100
Naples, Florida 34109
(239) 597-7088 – telephone
(239) 597-6984 - fax